1        UNITED STATES DISTRICT COURT
2       FOR THE DISTRICT OF PUERTO RICO


3    UNITED STATES OF AMERICA

4        Plaintiff,
5
6            v.

7    EFREN T. IRIZARRY-COLON,          CIVIL NO. 05-1607 (JAF)
8    ISMAEL L. ALFONZO-REYES,
9    VANESSA MORALES-HERNANDEZ, and
10   the conjugal partnership
11   constituted by both,

12       Defendants.


13                      **OPINION AND ORDER**

14       On June 7, 2005, the United States filed this action under the

15   False Claims Act (FCA), 31 U.S.C. §3729 <u>et seq</u>., the Financial

16   Institution Reform Recovery And Enforcement Act (FIRREA), 12 U.S.C.

17   §1833a and 18 U.S.C. §1014, and common law, to recover damages and

18   civil penalties from the defendants because of their false and

19   fraudulent claims and/or false and fraudulent statements made in

20   violation of federal and common law in support of or in relation to

21   applications for emergency and operating loans and applications for

22   indemnity under the Livestock Indemnity Program granted by the

23   United States Department of Agriculture, Farm Service Agency, for

24   alleged losses sustained as a result of Hurricane Georges. Summons

25   were served upon co-defendants Alfonzo and Morales personally on

26   July 13, 2005. On August 1, 2005, co-defendants Alfonzo and Morales

Civil No. 05-1607 (JAF)                                                    -2-

1    requested an extension of time to file an answer, which was granted

2    on August 30, 2005. On August 30, 2005, co-defendants Alfonzo and

3    Morales requested a second extension of time to file an answer,

4    which was also granted as the last extension, on September 2, 2005.

5    On October 25, 2005, the United States requested the entry of

6    default against co-defendants Alfonzo, Morales and the conjugal

7    partnership constituted by both. On November 4, 2005, this court

8    entered the default of co-defendants Alfonzo, Morales and the

9    conjugal partnership constituted by both.  More than eight months

10   have elapsed from the Order of this court granting the last

11   extension of time, and co-defendants Alfonzo, Morales and the

12   conjugal partnership constituted by both have failed to plead or

13   otherwise defend in this case. Under Rule 55 of the Federal Rules

14   of Civil Procedure, Judgment by Default may be entered against any

15   party who is in default.

16       This court has jurisdiction over this matter pursuant to 28

17   U.S.C. §1345 and its general equitable jurisdiction. Venue is

18   proper in this District under 28 U.S.C. §1391 and 31 U.S.C.

19   §3732(a).

20       We have before us a Motion for Judgment by Default as to co-

21   defendants Alfonzo, Morales and the conjugal partnership

22   constituted by both filed by the United States of America. It

23   appearing from the record on file in these proceedings that default

24   was entered upon their failure to answer or otherwise plead in this

Civil No. 05-1607 (JAF)                                                    -3-

1    case, and upon review of the allegations contained in the Complaint

2    and in the Motion for Judgment by Default, which have been

3    supported by uncontested documentary evidence, we find Plaintiff is

4    entitled to Judgment by Default under Rule 55 (b)(2) of the Federal

5    Rules of Civil Procedure, and we now enter our findings and

6    conclusions.

7                                    **I.**

8                                **The Facts**

9         The following facts have not been contested by co-defendants

10   Alfonzo, Morales and the conjugal partnership constituted by both.

11        On April 25, 2003, the Grand Jury returned a 22-count

12   indictment in Criminal Case #03-124 (JAG) charging Fernando Toledo-

13   Fernández, co-defendant Ismael L. Alfonzo-Reyes, co-defendant

14   Vanessa Morales-Hernández, José Torres-Correa, Gregorio Toledo-

15   González, Gregorio Toledo-Fernández, Pedro Toledo-Fernández, and

16   José Juan Toledo-Fernández with conspiracy to defraud the United

17   States (18 U.S.C. Section 371), false statements in loan

18   applications to the United States Department of Agriculture, Farm

19   Service Agency (hereinafter referred to as "FSA") (18 U.S.C.

20   Section 1014), false statements in application and/or certification

21   to obtain monies form FSA Livestock Indemnity Program (18 U.S.C.

22   Section 1014), bribery of public official (18 U.S.C. Section 201),

23   and acts affecting a personal financial interest (18 U.S.C. Section

24   208), all in connection with applications for emergency and

Civil No. 05-1607 (JAF)                                           -4-

1    operating  loans  granted  by  the  United  States  Department  of
2    Agriculture, Farm Service Agency, for alleged losses sustained as a
3    result of Hurricane Georges.

4         On  April  2,  2004,  the  Grand  Jury  returned  a  62-count
5    superseding  indictment  in  Criminal  Case  No.  03-124  (JAG),
6    superseding  the  previous  indictment  referred  to  in  the  preceding
7    paragraph,  against  the  same  named  defendants,  and  charging  them
8    with   conspiracy  to  defraud  the  United  States  (18 U.S.C.  Section
9    371),  false  statements  in  loan  applications  to  the  United  States
10   Department  of  Agriculture,  FSA  (18  U.S.C.  Section  1014),  false
11   statements  in  application  and/or  certification  to  obtain  monies
12   from  FSA  Livestock  Indemnity  Program  (18  U.S.C.  Section  1014),
13   bribery  of  public  official  (18  U.S.C.  Section  201),  and  acts
14   affecting  a  personal  financial  interest  (18  U.S.C.  Section  208),
15   all  in  connection  with  applications  for  emergency  and  operating
16   loans  granted  by  the  United  States  Department  of  Agriculture,  Farm
17   Service  Agency,  for  alleged  losses  sustained  as  a  result  of
18   Hurricane Georges.

19        At  all  times  pertinent  to  that  superseding  indictment,  co-
20   defendant  Ismael  Luis  Alfonzo-Reyes,  hereinafter  referred  to  as
21   "Alfonzo,"  was  employed  by  the  United  States  Department  of
22   Agriculture,  Farm  Service  Agency,  as  Farm  Loan  Manager  assigned  to
23   the  Ponce  office  until  May  9,  1999,  then  transferred  to  the  Arecibo
24   Office.

Civil No. 05-1607 (JAF)                                              -5-

1        At all times pertinent to that superseding indictment co-
2   defendant Vanessa Morales-Hernández, hereinafter referred to as
3   "Morales," was married to "Alfonzo," and under contract with the
4   Farm Service Agency, as a loan packager (person paid by FSA to help
5   farmers put together an application for loans at FSA, free of
6   charge to the borrower).  During times pertinent to this complaint,
7   "Morales" also worked independently of FSA, charging the borrowers
8   a percentage of the loan for her services.

9        At all times pertinent to the superseding indictment, Fernando
10  Toledo-Fernández, Gregorio Toledo-González, Gregorio Toledo-
11  Fernández, Pedro Toledo-Fernández, and José Juan Toledo-Fernández
12  were cattlemen in the Arecibo/Hatillo region of Puerto Rico and
13  owned several farms and corporations dedicated to milk production
14  and cattle raising. Fernando Toledo-Fernández and Gregorio Toledo-
15  Fernández were the owners and in control of the affairs of Gregorio
16  Toledo, Inc., dedicated to the business of cattle sales. Gregorio
17  Toledo, Inc. (owned by Fernando Toledo-Fernández and Gregorio
18  Toledo-Fernández,) was the owner of and in control of the affairs
19  of Café Dairy, Inc., dedicated to the business of milk production.
20  Gregorio Toledo-Fernández and Pedro Toledo-Fernández were the
21  owners of and in control of the affairs of Toledo Dairy, Inc.,
22  dedicated to the business of milk production. Gregorio Toledo-
23  González was the owner of and in control of the affairs of Marina
24  Dairy, Inc., dedicated to the business of milk production. Pedro

Civil No. 05-1607 (JAF)                                              -6-

1    Toledo-Fernández was the owner of and in control of the affairs of

2    PTF, Inc., dedicated to the business of milk production. José Juan

3    Toledo-Fernández was the owner of and in control of the affairs of

4    J. Dairy, Inc., dedicated to the business of milk production.

5        At all times pertinent to the superseding indictment, José

6    Torres-Correa, was the Farm Program Director of FSA in Puerto Rico.

7        At all times pertinent to the superseding indictment, Juan

8    Isidoro Barreto-Barreto, Glorimar Barreto-Ginorio, Juan Félix

9    Barreto-Ginorio, Juan Manuel Barreto-Ginorio, Ramón L. Barreto-

10   Ginorio, Luis René Delgado-Pérez, Jorge Herrera-Mora (now

11   deceased), Luis R. Martínez-Martínez, Edgardo Mercado-Rosa, Carlos

12   H. Ortiz-Colón, Juan J. Peraza-Mora, Nelson Ramos-Irizarry, Carmelo

13   Rivera-Rivera, José Zaragoza-Urdaz, Teodoro Alfonzo-Toledo, Jorge

14   Delgado-Pérez, Ismael Delgado-Pérez, Ivan Rosa-Toledo, Luis M.

15   Ruiz-Ruiz, and Pedro Vélez-Cabrera, were cattlemen in the Arecibo

16   region of Puerto Rico.

17       In Count One of the superseding indictment, both Alfonzo and

18   Morales were charged with conspiracy to defraud and commit offenses

19   against the United States (18 U.S.C. Section 371) as follows:

20   Beginning on or about September 26,1998, and continuing up to and

21   until in or about July 2000, in Arecibo, Hatillo, San Juan,

22   Mayaguez, Camuy, Ponce, and Coamo, Puerto Rico, and other areas in

23   the District of Puerto Rico and elsewhere within the jurisdiction

24   of the court, the defendants therein (including Alfonzo and

1    Morales), and José Torres-Correa, Edgardo Mercado-Rosa, Jorge

2    Herrera-Mora (now deceased), Carlos H. Ortiz-Colón, Juan J. Peraza-

3    Mora, Nelson Ramos-Irizarry, Carmelo Rivera-Rivera, Juan Isidoro

4    Barreto-Barreto, Glorimar Barreto-Ginorio, Juan Félix Barreto-

5    Ginorio, Juan Manuel Barreto-Ginorio, Ramon Barreto-Ginorio, Luis

6    René Delgado-Pérez, Luis Martínez-Martínez, Jorge Delgado-Pérez,

7    José Zaragoza-Urdaz, and others known and unknown to the grand

8    jury, did knowingly and willfully conspire, confederate and agree

9    together and with each other to: (1) defraud the Farm Service

10   Agency, an agency of the United States, in excess of $10 Million,

11   in the process of evaluating, approving, and disbursing emergency

12   and operating loans and providing awards and incentives available

13   to farmers that qualified and who were in need because of damages

14   suffered as a consequence of the passing of Hurricane Georges

15   through the island of Puerto Rico on or about September 21, 1998;

16   and/or (2) make false statements or reports, or overvalue land,

17   property or security for the purpose of influencing the actions of

18   the Secretary of Agriculture, acting through the Farm Service

19   Agency, in connection with applications for emergency and operating

20   loans, and incentive programs.

21        On September 24, 1998, the President of the United States

22   declared that a major disaster existed in the Commonwealth of

23   Puerto Rico. This declaration was based on the damages resulting

24   from Hurricane Georges, which occurred on September 21, 1998.

Civil No. 05-1607 (JAF)                                                    -8-

1      This  disaster  declaration  resulted  in  the  availability  of

2      emergency  loans  at  low-interest  rates,  as  well  as  free  monetary

3      awards  for  fence  damages  and  cattle  losses,  all  provided  by  the

4      federal  Farm  Service  Agency  ("FSA").   FSA  also  provided  operating

5      loans  at  low-interest  rates,  the  number  of  which  was  substantially

6      increased  due  to  claims  asserted  following  the  hurricane.   The

7      maximum  an  individual  or  related  entity  can  receive  from  an

8      emergency  loan  is  $500,000;  and  from  an  operating  loan,  $200,000.

9      In  the  Superseding  Indictment  the  overt  acts  committed  by  the

10     members  of  the  conspiracy  were  described  as  follows.  On  or  about

11     October  13,  1998,  at  El  Buen  Café  Restaurant  in  Hatillo,  Puerto

12     Rico,  Fernando  Toledo-Fernández,  co-defendant  Alfonzo,  and  José

13     Torres-Correa  met  and  discussed  the  process  of  applying,  processing

14     and  obtaining  emergency  and  operating  loans  from  FSA  for  Fernando

15     Toledo-Fernández  and  his  family  corporations,  as  well  as  for  other

16     cattlemen  from  the  Arecibo  region.

17     On  or  about  October  13,  1998,  Alfonzo,  offered  a  kickback  of

18     approximately  $130,000  to  José  Torres-Correa,  for  expediting,

19     approving,  and  disbursing  emergency  and  operating  loans  from  FSA  to

20     approximately  twelve  to  fifteen  cattlemen  from  the  Arecibo  region.

21     On  or  about  the  same  date  referred  to  in  the  above-mentioned

22     paragraph,  Alfonzo  agreed  that  his  wife,  Morales,  would  be

23     recruited  to  serve  as  a  loan  packager  to  prepare  the  loan

24     applications  for  a  group  of  cattlemen  from  the  Arecibo  region.

1       On or about the same date as referred to in the above-
2    mentioned paragraph, Alfonzo agreed to charge a 4% commission to
3    the cattlemen from the total amount of the loans proceeds
4    disbursed, to be divided between himself (Alfonzo) and his wife,
5    Morales, José Torres-Correa, and an unnamed person.

6       On or about the same date as referred to in the above-
7    mentioned paragraph, it was agreed by Fernando Toledo-Fernández, an
8    unnamed person, and co-defendant Alfonzo that Fernando Toledo-
9    Fernández would be in charge of recruiting cattlemen to seek
10   emergency and operating loans from FSA.

11      In or about October 1998, Fernando Toledo-Fernández invited
12   family members and other cattlemen from the Arecibo region to his
13   home, in order to offer the services of an attorney for the purpose
14   of preparing and expediting applications, and the disbursement of
15   emergency and operating loans to be obtained from FSA. On the same
16   date as referred to in the above-mentioned paragraph, co-defendant
17   Alfonzo went to the residence of Fernando Toledo-Fernández, spoke
18   to the group of cattlemen, and explained the emergency and
19   operating loans available from FSA. At that meeting, co-defendant
20   Alfonzo introduced his wife, co-defendant Morales, as an FSA-
21   authorized loan packager that would be working with the attorney
22   that Fernando Toledo-Fernández introduced to the group.

23      From in or about September 1998 to January 2000, Morales
24   assisted Fernando Toledo-Fernández, Gregorio Toledo-González,

Civil No. 05-1607 (JAF)                                        -10-

1    Gregorio Toledo-Fernández, Pedro Toledo-Fernández, José Juan

2    Toledo-Fernández, Juan Isidoro Barreto-Barreto, Glorimar Barreto-

3    Ginorio, Juan Félix Barreto-Ginorio, Juan Manuel Barreto-Ginorio,

4    Ramón L. Barreto-Ginorio, Luis René Delgado-Pérez, Luis R.

5    Martínez-Martínez, Edgardo Mercado-Rosa, Carlos H. Ortiz-Colón,

6    Juan J. Peraza-Mora, Nelson Ramos-Irizarry, Carmelo Rivera-Rivera,

7    José Zaragoza-Urdaz and others, in submitting false information in

8    their loan application documents to FSA, in order to obtain

9    emergency and/or operating loans.

10       The false information submitted to Farm Service Agency to

11   support the loan applications consisted in false Certification of

12   Losses, which contained false and or inflated information as to the

13   physical losses of dairy cattle and damages to farm fences on

14   account of Hurricane Georges, other false documents, letters and

15   certifications to support these losses, and Requests for Lender

16   Verification of Loan Application from several commercial financial

17   institutions which contained false information to support their

18   loan application(s) with FSA.

19       From in or about October 1998 to January 2000, co-defendant

20   Alfonzo, while being the Farm Loan Manager for the Ponce field

21   office of FSA, and after his transfer to the Arecibo field office

22   of FSA, personally worked on the loan application documents of

23   cattlemen that his wife, co-defendant Morales, had prepared as loan

24   packager.

Civil No. 05-1607 (JAF)                                        -11-

1        Between October 1998 and February 2000, co-defendants Alfonzo

2    and Morales knowingly presented, or caused to be presented, false

3    or fraudulent loan applications, running records, forms, documents,

4    vouchers,   invoices,   records,   certification   of   losses,   loan

5    verifications,   financial   statements,   and   other   documents,

6    statements,  and/or  records  that  were  used  to  submit,  process,

7    authorize, approve, grant, and/or pay Farm Service Agency emergency

8    and operating loans in excess of $10 Million to Fernando Toledo-

9    Fernández, Gregorio Toledo-Fernández, José Juan Toledo-Fernández,

10   Pedro Toledo-Fernández, Gregorio Toledo González, Edgardo Mercado-

11   Rosa, Carlos H. Ortiz-Colón, Juan J. Peraza-Mora, Nelson Ramos-

12   Irizarry,  Carmelo  Rivera-Rivera,  Juan  Isidoro  Barreto-Barreto,

13   Glorimar Barreto-Ginorio, Juan Félix Barreto-Ginorio, Juan Manuel

14   Barreto-Ginorio,  Ramón  Barreto-Ginorio,  Luis  René  Delgado-Pérez,

15   Luis Martínez-Martínez, and José Zaragoza-Urdaz, and other dairy

16   farmers in the Arecibo area.

17       With respect to the false information presented or caused to

18   be presented to FSA in support of the loan applications, Alfonzo

19   and  Morales  had  either  actual  knowledge  of  the  said  false

20   information, and/or acted in deliberate ignorance of the truth or

21   falsity of said information, and/or acted in reckless disregard of

22   the truth or falsity of said information.

23       In or about March 1999, José Torres-Correa suggested to the

24   State Executive Director of FSA in Puerto Rico that he transfer co-

Civil No. 05-1607 (JAF)                                      -12-

1    defendant Alfonzo from the FSA field office in Ponce to the FSA

2    field office in Arecibo.

3        Sometime after May 9, 1999, but prior to September 24, 1999,

4    co-defendant Alfonzo, as Farm Loan Manager and County Supervisor of

5    the Arecibo office of FSA, requested from José Torres-Correa that

6    he approve and authorize for disbursement the loan applications of

7    Fernando   Toledo-Fernández,   Gregorio   Toledo-González,   Gregorio

8    Toledo-Fernández,   Pedro   Toledo-Fernández,   José   Juan   Toledo-

9    Fernández, Juan Isidoro Barreto-Barreto, Glorimar Barreto-Ginorio,

10   Juan Félix Barreto-Ginorio, Juan Manuel Barreto-Ginorio, Ramón L.

11   Barreto-Ginorio,   Luis   René   Delgado-Pérez,   Luis   R.   Martínez-

12   Martínez,   Edgardo   Mercado-Rosa,   Carlos   H.   Ortiz-Colón,   Juan J.

13   Peraza-Mora,   Nelson   Ramos-Irizarry,   Carmelo   Rivera-Rivera,   José

14   Zaragoza-Urdaz, and other cattlemen in the Arecibo region.

15       On June 9, 1999, Alfonzo, as FSA Loan Manager in Arecibo,

16   falsely certified that the losses and damages claimed by various

17   dairy farmers on their emergency loan application documents were

18   reasonable and of sufficient magnitude to qualify them for an

19   emergency loan.

20       On June 9, 1999, José Torres-Correa, as Farms Program Director

21   of FSA in Puerto Rico, approved and authorized the disbursement of

22   disaster-related   loans   to   Fernando   Toledo-Fernández,   Gregorio

23   Toledo-González, Gregorio Toledo-Fernández, Pedro Toledo-Fernández,

24   José Juan Toledo-Fernández, Edgardo Mercado-Rosa, Carlos H. Ortiz-

1    Colon, Juan J. Peraza-Mora, Juan Isidoro Barreto-Barreto, Glorimar
2    Barreto-Ginorio, Juan Félix Barreto-Ginorio, Juan Manuel Barreto-
3    Ginorio, Nelson Ramos-Irizarry, Carmelo Rivera-Rivera, Luis René
4    Delgado-Pérez, and José Zaragoza-Urdaz, which loan documents
5    contained false information.

6        Between November 2003 and March 2005, José Torres-Correa,
7    Gregorio Toledo-González, Gregorio Toledo-Fernández, Pedro Toledo-
8    Fernández, Edgardo Mercado-Rosa, Carlos H. Ortiz-Colón, Juan J.
9    Peraza-Mora, Ramón Barreto-Ginorio, Juan Isidoro Barreto-Barreto,
10   Glorimar Barreto-Ginorio, Juan Félix Barreto-Ginorio, Juan Manuel
11   Barreto-Ginorio, Nelson Ramos-Irizarry, Carmelo Rivera-Rivera, Luis
12   René Delgado-Pérez, and José Zaragoza-Urdaz, all plead guilty to a
13   count of loan fraud (18 USC §1014), for knowingly making false
14   statements or reports to obtain the FSA loans subject of this case.

15       On March 18, 2005, Fernando Toledo-Fernández plead guilty to a
16   count of conspiracy and a count of loan fraud (18 USC §1014) for
17   knowingly making false statements or reports to obtain the FSA
18   loans subject of this complaint.

19       From on or about July 1999 to February 2000, FSA disbursed to
20   Fernando Toledo-Fernández, Gregorio Toledo-González, Gregorio
21   Toledo-Fernández, Pedro Toledo-Fernández, José Juan Toledo-
22   Fernández, Edgardo Mercado-Rosa, Carlos H. Ortiz-Colón, Juan J.
23   Peraza-Mora, Juan Isidoro Barreto-Barreto, Glorimar Barreto-
24   Ginorio, Juan Félix Barreto-Ginorio, Juan Manuel Barreto-Ginorio,

Civil No. 05-1607 (JAF)                                          -14-

1      Nelson Ramos-Irizarry, Carmelo Rivera-Rivera, Luis René Delgado-

2      Pérez, Ramón Barreto-Ginorio, Luis Martínez-Martínez, and José

3      Zaragoza-Urdaz, a total of  $8,231,530 in Emergency Loan Funds and

4      $2,200,000 in Operating Loan funds.

5          A reading of the Superseding Indictment, copy of which was

6      submitted as part of the Memorandum in Support of the Motion for

7      Judgment by Default, shows that Alfonzo and Morales submitted or

8      caused to be submitted to the Farm Service Agency at least one-

9      hundred eighteen false claims or statements in relation to or in

10     support of the emergency and operation loans disbursed by said

11     agency. In addition, Alfonzo was charged and found guilty on Eight

12     Counts (Counts Forty-Four through Fifty-One) of false statements on

13     application and/or certification to obtain monies from the Farm

14     Service Agency Livestock Indemnity Program (18 U.S.C. § 1014).

15     This adds at least Eight more false claims or statements attributed

16     to Alfonzo in relation to FSA Livestock Indemnity Program.

17         From in or about July 1999 to February 2000, co-defendant

18     Morales was paid $202,322.82 for her participation in preparing

19     emergency and operating loan applications packages with false

20     information for Fernando Toledo-Fernández, Gregorio Toledo-

21     González, Gregorio Toledo-Fernández, Pedro Toledo-Fernández, José

22     Juan Toledo-Fernández, Juan Isidoro Barreto-Barreto, Glorimar

23     Barreto-Ginorio, Juan Félix Barreto-Ginorio, Juan Manuel Barreto-

24     Ginorio, Ramón L. Barreto-Ginorio, Luis René Delgado-Pérez, Luis R.

1    Martínez-Martínez, Edgardo Mercado-Rosa, Carlos H. Ortiz-Colón,

2    Juan J. Peraza-Mora, Nelson Ramos-Irizarry, Carmelo Rivera-Rivera,

3    José Zaragoza-Urdaz, and other farmers.

4         From in or about August 1999 to March 2000, co-defendants

5    Alfonzo and Morales paid approximately $18,000 in cash to José

6    Torres-Correa, for his role in expediting, approving, and

7    authorizing disbursements of various emergency and operating loans

8    to several cattlemen in the Arecibo region of Puerto Rico.

9         At different times during the existence of this conspiracy,

10   co-defendant Alfonzo assured José Torres-Correa that he did not

11   have to pay a $50,000 debt he had with co-defendant Alfonzo, in

12   exchange for his role in expediting, approving, and authorizing

13   disbursements of various emergency and operating loans to several

14   cattlemen in the Arecibo region of Puerto Rico.

15        With respect to the false and fraudulent information presented

16   or caused to be presented to FSA related to the loan closings, and

17   the payment of kickbacks to José Torres-Correa, co-defendants

18   Alfonzo and Morales had either actual knowledge of the said false

19   information and kickbacks, and/or acted in deliberate ignorance of

20   the truth or falsity of said information and kickbacks, and/or

21   acted in reckless disregard of the truth or falsity of said

22   information and kickbacks.

23        On or about September 1, 1999, through on or about January 10,

24   2000, the Farm Service Agency disbursed to Fernando Toledo-

1   Fernández, Gregorio Toledo-Fernández, José Juan Toledo-Fernández,

2   Pedro Toledo-Fernández, Gregorio Toledo González, Edgardo Mercado-

3   Rosa, Carlos H. Ortiz-Colón, Juan J. Peraza-Mora, Nelson Ramos-

4   Irizarry, Juan Isidoro Barreto-Barreto, Glorimar Barreto-Ginorio,

5   Juan Félix Barreto-Ginorio, Juan Manuel Barreto-Ginorio, Ramón

6   Barreto-Ginorio, Luis René Delgado-Pérez, Jorge Delgado-Pérez, and

7   José Zaragoza-Urdaz, Teodoro Alfonso-Toledo, Ismael Delgado-Pérez,

8   Iván Rosa Toledo, Luis M. Ruiz-Ruiz, Pedro Vélez-Cabrera, and other

9   dairy farmers in the Arecibo area a total of $364,784 in free

10  livestock indemnity monies under the FSA Livestock Indemnity

11  Program. Co-defendant Alfonzo was charged and found guilty of

12  knowingly presenting, or causing to be presented, false or

13  fraudulent applications, records, forms, documents, vouchers,

14  invoices, certification of losses, and other documents, statements,

15  and/or records that were used to submit, process, authorize,

16  approve, grant, and/or pay Farm Service Agency free livestock

17  indemnity monies under the FSA Livestock Indemnity Program in Eight

18  Counts.

19       The false statements consisted in that these dairy farmers,

20  with the knowledge, assistance and/or advice of co-defendant

21  Alfonzo, claimed that they had lost certain number of cows and

22  heifers as a consequence of Hurricane Georges when they well knew

23  that this information was false.

Civil No. 05-1607 (JAF)                                    -17-

1        In addition to the fact that co-defendants Alfonzo, Morales

2    and the conjugal partnership constituted by both, have failed to

3    contest any of the aforementioned facts, on December 22, 2004,

4    after a six-month trial, a jury found both co-defendants Alfonzo

5    and Morales guilty on Count One of the Superseding Indictment

6    (Conspiracy to Defraud and Commit Offenses Against the United

7    States, 18 U.S.C. Section 371), and on Counts Two through Thirteen

8    (False statements in loan applications, 18 U.S.C. Section 1014), on

9    Count Twenty (Bribery of Public Official, 18 U.S.C. Section 201),

10   on count Twenty-Two through Forty-Six (Acts Affecting a Personal

11   Financial Interest, 18 U.S.C. Section 208).[1] In addition, Alfonzo

12   was found guilty on Counts Forty-Four through Fifty-One (False

13   statements on application and/or certification to obtain monies

14   from the Farm Service Agency Livestock Indemnity Program, 18 U.S.C.

15   Section 1014), all in relation to the FSA loans and programs

16   subject of the complaint in the case at bar. Alfonzo and Morales

17   were sentenced by this court on February 17 and 13, 2006,

18   respectively.

19                                  **II.**

20                         **The False Claims Act**

21       Plaintiff contends that Judgment by Default should be entered

22   in its favor under the False Claims Act (31 U.S.C. §3729 et seq.).

---

[1]Except that Morales was **not found guilty** as to counts 22, 41,
and 43 through 46.

Civil No. 05-1607 (JAF)                                      -18-

The False Claims Act establishes seven acts, each of which constitutes a basis for liability. 31 U.S.C. §3729(a). The most common provisions impose liability on any person who:

> (1) knowingly presents, or causes to be presented to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

> (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

> (4) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.

31 U.S.C.§3729(a)

In addition, the False Claims Act, 31 U.S.C. §3729(b), provides that:

> For the purpose of this section, the term "knowing" and "knowingly" means that a person, with respect to information

> (1) had actual knowledge of the information;

> (2) acts in deliberate ignorance of the truth or falsity of the information; or

> (3) acts in reckless disregard of the truth or falsity of the information,

> **and no proof of specific intent to defraud is required.**(Emphasis added)

1      The case law construing 31 U.S.C. §3729(b) affirms the clear

2  language of the statute and the intentions of Congress that "no

3  proof of specific intent to defraud is required". U.S. v. Cabrera-

4  Diaz, 106 F. Supp. 2d 234, 239 (D.P.R. 2000). Notwithstanding the

5  above, in the case at bar, the United States has exceeded the

6  requirement of the False Claims Act regarding intent or knowledge.

7  Here, both Alfonzo and Morales have acted with criminal intent to

8  defraud the United States and to file false claims/statements, as

9  it appears from their conviction in criminal case 03-124 (JAG),

10  and, therefore, the government has established intent or knowledge

11  beyond the requirements of the False Claims Act.

12      As stated in U.S. v. Cabrera-Diaz, supra, the False Claims Act

13  provides that any person who violates its provisions is liable to

14  the United States for "a civil penalty of not less than $5,000 and

15  not more than $10,000, plus 3 times the amount of damages which the

16  Government sustains because of the act of that person." 31 U.S.C.

17  §3729(a). Persons violating the Act are also liable for the cost of

18  litigation. Id.

19  **A.  Damages**

20      There is no set formula for measuring damages under the False

21  Claims Act. Damages have been measured in a variety of ways and the

22  measure applied by the courts in specific cases has been greatly

23  influenced by the nature of the fraud and the type of Government

24  transaction affected by it.

1    "The measure of the government's damages [is] the amount that

2    it paid out by reason of the false statements over and above what

3    it would have paid if the claims had been truthful." <u>United States</u>

4    <u>v. Woodbury</u>, 359 F.2d 370, 379 (9th Cir. 1966); <u>accord</u> <u>TDC</u>, 288

5    F.3d at 428 ("measure of damages [is] based on what the government

6    would have paid out had it known of the information that

7    [defendant] omitted"); <u>United States v. Cabrera-Diaz</u>, 106 F.Supp.2d

8    234 (D.P.R. 2000) (damages are "the amount the Government would not

9    have paid had it known the true facts"); <u>United States ex rel. Roby</u>

10   <u>v. Boeing Co.</u>, 79 F. Supp. 877 (S.D. Ohio 1999) ("A court should

11   ask the question, 'How much would the government have paid for the

12   item   at   issue   'but   for'   the   fraudulent   actions   of   the

13   defendant?'"); <u>BMY Combat Systems v. United States</u>, 44 Fed. Cl.

14   141, 147 (Ct. Cl. 1999) ("[T]he measure of the government's damages

15   would be the amount that it paid out by reason of the false

16   [claims] over and above what it would have paid if the claims had

17   been truthful") (quoting <u>Woodbury</u>, 359 F.2d at 379).

18       This rule of damages was confirmed by the Supreme Court nearly

19   sixty years ago in <u>U.S. ex rel. Marcus v. Hess</u>, 317 U.S. 537

20   (1943), which involved collusive bidding on a government contract.

21   The trial court held that the measure of damages was "the money

22   which the Government contributed to each project in excess of what

23   it would have paid, had there been fair and open competition."  41

24   F. Supp. 197, 214 (W.D. Pa. 1941).  The Supreme Court affirmed the

Civil No. 05-1607 (JAF)                                           -21-

1    district court's ruling, observing that the "chief purpose of the

2    [FCA] was to provide for restitution to the government of money

3    taken from it by fraud."  317 U.S. at 551.

4         In TDC, the D.C. Circuit relied upon the Supreme Court's

5    decision in Hess to reject an argument similar to that advanced by

6    Defendants here.  The TDC defendants had been hired by the

7    government to develop a minority bonding program.  The government

8    brought a FCA action against the defendants after discovering that

9    they had failed to comply with the program's conflict of interest

10   rules.   In the trial court, the defendants argued that the

11   government suffered no damages despite their conflict of interest

12   because the government got the program it paid for.  In rejecting

13   that argument, the trial court held that the proper question in

14   determining damages is: "How much would the government have paid

15   for the item at issue 'but for' the fraudulent actions of the

16   defendant?" United States v. TDC Management Corp. et al., CA

17   No. 89-1533, at 11 (Feb. 6, 2001) (quoting Roby, 79 F. Supp.2d at

18   877) (appended as Attachment A).  The trial court concluded: "Had

19   the Government been aware of the program deviations, it would not

20   have continued to expend funds on the minority bonding program.

21   Therefore, [defendant] is liable for damages on all submitted

22   vouchers starting with the first fraudulent voucher . . . ." Id.

23   at 12.   The D.C. Circuit affirmed the trial court's decision,

24   concluding that it was consistent with the standard in Hess and

1    that it "properly applied a 'but for' measure of damages based on

2    what the government would have paid out had it known of the

3    information that [defendant] omitted." TDC, 288 F.3d at 428.

4       A similar damage rule was applied by the court in United

5    States v. Globe Remodeling Co., 196 F. Supp. 652 (D. VT 1961),

6    which involved a factual situation similar to the instant matter.

7    In that case, the defendants were found liable for having

8    fraudulently induced the Federal Housing Administration ("FHA") to

9    insure a home improvement loan.  When the borrowers defaulted, the

10   FHA was required to pay the lending institution.  Subsequently, the

11   borrowers fully repaid the government.  Nevertheless, the court

12   held that the government's damages were the full amount of the

13   "original loss" to the government occasioned by its payment to the

14   lending institution.  Id. at 657.  The court gave defendants credit

15   for the repaid amounts, but only after doubling[2] the government's

16   initial damages.

17      In Young Montenay v. United States, 15 F.3d 1040 (Fed Cir.

18   1994), the defendant falsely claimed progress payments for $49,000

19   in expenses it had not yet incurred.  Because the work was

20   subsequently performed, the defendant argued at trial that the

21   government's damages were limited to lost interest on the early

22   payments.  The trial court disagreed and held that the government's

_____

        [2]Under the pre-1986 version of the FCA, the government was
entitled to double, rather than treble, damages.

1    damages were the full $49,000.  On appeal, the Federal Circuit

2    affirmed.  Looking to the amount of money the government paid out

3    at the time the fraudulent conduct occurred, the court concluded

4    that the government "was denied the use of" the full amount of the

5    false progress payments.  Id. at 1043 & n.3.

6        As these cases make clear, the touchstone of FCA damages is

7    the pay-out of government funds as a result of the defendant's

8    fraud.  Once funds are fraudulently procured from the treasury and

9    are no longer available for use by the government, the United

10   States has suffered a loss that gives rise to damages under the

11   FCA.  Such a rule recognizes the opportunity cost to the government

12   due to the unavailability of these funds.  This rule is also

13   consonant with the FCA's "chief purpose of provid[ing] for

14   restitution to the government of money taken from it by fraud."

15   Hess, 317 U.S. at 551.  It ensures that the government will be

16   fully compensated for any fraud on the public fisc, and avoids

17   subjecting the government's right of recovery to the unknown risks

18   of future events.  For this reason, the courts have correctly held

19   that the government is entitled to damages under the FCA whenever

20   it pays out money it would not have paid but for the defendant's

21   fraud – regardless of any other recourse the government might

22   possess to recoup the lost funds.

23       Here, it is undisputed that Alfonzo's and Morales' fraud

24   caused the FSA to pay out at least $10 Million in emergency and

1   operating loans and Livestock Indemnity Program funds it would not

2   otherwise have disbursed.   Accordingly, Alfonzo's and Morales'

3   fraud caused the FSA to disburse at least $10 Million it would not

4   otherwise have paid out.  These payments constitute damages subject

5   to the FCA's trebling provisions.

6        A logical and necessary corollary to the rule that FCA damages

7   arise whenever the government is fraudulently induced to pay out

8   money from the treasury, is the principle that any subsequent

9   recoupment of those payments does not negate the government's claim

10  for damages.  This latter principle was expressly confirmed by the

11  Supreme Court's seminal decision in United States v. Bornstein, 423

12  U.S. 303 (1976), where the Supreme Court held that a recoupment

13  entitles the defendant to an offset once the government's damages

14  are multiplied, but does not reduce the amount of the government's

15  initial loss.

16       In Bornstein, a subcontractor was found liable for causing the

17  prime contractor to submit false claims to the United States for

18  397 radio kits that did not meet government specifications.

19  Subsequent to the submission of the false claims, the government

20  recouped from the prime contractor the cost of replacing most of

21  the faulty radio kits.  Both the trial court and the appellate

22  court concluded that the government's damages should be reduced by

23  the amount recouped from the prime contractor.  The Supreme Court

24  reversed.  The Court held that, "in computing the double damages

Civil No. 05-1607 (JAF)                                          -25-

1    authorized by the Act, the Government's actual damages are to be
2    doubled before any subtractions are made for compensatory payments
3    previously received by the Government from any source."  423 U.S.
4    at 316.

5        As <u>Bornstein</u> itself recognized, its rule on recoupment serves
6    several beneficial purposes. First, the rule preserves the FCA's
7    treble damages provision both as a deterrent against fraud and a
8    vehicle for ensuring full restitution of the government's loss.  If
9    a defendant can "avoid the Act's [treble]-damage provision by
10   tendering the amount of the [untrebled] damages at any time prior
11   to judgment . . . this possibility would make the [treble] damage
12   provision meaningless."  423 U.S. at 316.

13       Second, multiplying damages before applying any offset is
14   "consistent with the congressional judgment that [multiple] damages
15   are necessary to compensate the Government completely for the
16   costs, delays, and inconveniences occasioned by fraudulent claims."
17   <u>Id.</u> at 530-31.

18       Third, the rule "fixes the liability of the defrauder without
19   reference to the adventitious actions of other persons."  Thus, it
20   ensures that "two [defendants] who committed similar acts and
21   caused similar damage" will not be "subject to widely disparate
22   penalties depending on whether and to what extent [a third party]
23   ha[s] paid the Government."  <u>Id.</u>

1      Finally, <u>Bornstein</u>'s holding promotes mitigation of damages.

2   The United States would have little incentive to pursue collection

3   efforts if those efforts would nullify its right to claim treble

4   (or any) damages.

5      In light of these considerations, any recoupment is to be

6   credited only after the government's damages are multiplied.[3]

7   Significantly, nothing in these cases holds or suggests that

8   <u>Bornstein</u>'s recoupment rule turns on the nature or source of the

9   particular recoupment.  Indeed, <u>Bornstein</u> itself forecloses such an

10  interpretation.   <u>Bornstein</u> twice emphasized that its holding

11  applies to subsequent payments received from the government "from

12  any source."  423 U.S. at 316; <u>see also</u> <u>Hill</u>, 676 F. Supp. at 1182

13  ("The Government is entitled to damages . . . equal to triple the

14  losses it actually incurred, reduced by payments received from any

15  other source.").

16     In short, the government incurred damages when Alfonzo and

17  Morales fraudulently induced the FSA to disburse $10 Million in

18  fraudulent loans and (Alfonzo) $364,784 in Livestock Indemnity

19  Program, which funds the government "was denied the use of" until

─────────────────

        [3]<u>See</u> <u>United States v. Ekelman & Associates, Inc.</u>, 532 F.2d 545,
549 (6th Cir. 1976); <u>Cabrera-Diaz</u>, 106 F.Supp.2d at 241; <u>United
States v. Entin</u>, 750 F. Supp. 512, 519 (S.D. Fla. 1990) ; <u>United
States v. Hill</u>, 676 F. Supp. 1158, 1182 (N.D. Fla. 1987); <u>United
States v. Heck</u>, 1987 WL 49253 at * 6 (D.N.J. 1987); <u>United States v.
Canada</u>, 425 F. Supp. 91, 92 (S.D. Ind. 1977); <u>BMY</u>, 44 Fed. Cl. at
150; <u>Globe</u>, 196 F. Supp. at 657.

1    they  were  later  partially  repaid.  Under  <u>Bornstein</u>,  belated

2    repayment  of  these  monies  may  entitle  Alfonzo  and  Morales  to  a

3    credit,  but  only  after  the  government's  damages  are  trebled.   This

4    repayment  does  not  entitle  Alfonzo  and  Morales  to  turn  back  the

5    clock  and  pretend  that  their  fraudulent  scheme – and  the  resulting

6    $10 Million  disbursement  by  the  FSA – never  occurred.

7    **B.   <u>Civil Penalties</u>**

8         The  False  Claims  Act  provides  that  a  person  who  commits  any  of

9    the  acts  specified  in  31 U.S.C. §3729 (a) (1) - (7)  is  liable  for  a

10   "civil  penalty  of  not  less  than  $5,000  and  not  more  than  $10,000.".

11        The  report  of  the  Senate  Judiciary  Committee  summarizes  the

12   law  with  respect  to  civil  penalties  as  follows:

13            The  imposition  of  this  forfeiture  is  **automatic**
14            **and mandatory**  for  each  claim  which  is  found  to
15            be  false.  The  United  States  is  entitled  to
16            recover  such  forfeiture  solely  upon  proof  that
17            false  claims  were  made,  without  proof  of  any
18            damages.  <u>Fleming v. United States</u>,  336 F.2d
19            475,  480 (10th Cir. 1964),  cert. denied,  380
20            U.S. 907 (1965).  A  forfeiture  may  be  recovered
21            from  one  who  submits  a  false  claim  though  no
22            payments  were  made  on  the  claim.  <u>United States</u>
23            <u>v American  Precision  Products  Corp</u>.,  115  F.
24            Supp. 823 (D.N.J. 1953)

25            Each  separate  bill,  voucher  or  other  "false
26            payment  demand"  constitutes  a  separate  claim
27            for  which  a  forfeiture  shall  be  imposed,  see
28            for  example,  <u>United  States  v.  Bornstein</u>,  423
29            U.S.  303 (1976),  <u>United  States  v.  Collyer</u>
30            <u>Insulated  Wire  Co.</u>,  94  F.  Supp. 493 (D.R.I.
31            1950),  and  this  is  true  although  many  such
32            claims  may  be  submitted  to  the  Government  at
33            one  time.  For  example,  a  doctor  who  completes
34            separate  Medicare  claim  for  each  patient

1      treated will be liable for a forfeiture for
2      each such form that contains false entries even
3      though several such forms may be submitted to
4      the fiscal intermediary at one time.

5 S. Rep. No 345, 99th Cong., 2d Sess. 8-10 (1986), reprinted in 1986

6 U.S.C.C.A.N. 5266, 5273-75.

7   As stated by Congress, the "United States is entitled to

8 recover [civil penalties] solely upon proof that false claims were

9 made, without proof of any damages." S. Rep. No. 345, 99th Cong.,

10 2d Sess. 8 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5273. The

11 primary cases concerning the issue are United States ex rel. Marcus

12 v. Hess, 317 U.S. 537 (1943); Rex Trailer Co. v. United States, 350

13 U.S. 148 (1956); and United States v. Rohleder, 157 F.2d 126 (3rd

14 Cir. 1946). See also In re Schemmels, 85 F.3d 416 (91:h Cir. 1996)

15   The legislative history of the 1986 amendments makes clear

16 that civil penalties are "automatic and mandatory for each claim

17 which is false." S. Rep. No. 345, 99th Cong., 2d Sess. 8 (1986),

18 reprinted in 1986 U.S.C.C.A.N. 5266, 5273. Thus, up to a certain

19 point, the number of civil penalties, or whether to even assess

20 civil penalties, is not discretionary. "This forfeiture provision

21 is mandatory; it leaves the trial court without discretion to alter

22 the statutory amount." United States v. Hughes, 585 F.2d 284, 286

23 (7th Cir. 1978). The point at which a court may gain some

24 discretion and limit the number of penalties is when the penalties

1    are deemed "excessive". See United States v. Halper, 490 U.S. 435

2    (1989).

3         A reading of the Superseding Indictment shows that Alfonzo and

4    Morales submitted or caused to be submitted to the Farm Service

5    Agency at least one-hundred eighteen false claims or statements in

6    relation to or in support of the emergency and operation loans

7    disbursed by said agency. A jury adjudicated that both Alfonzo and

8    Morales had incurred in such false statements and claims as they

9    found them guilty on Count One of the Superseding Indictment

10   (Conspiracy to Defraud and Commit Offenses Against the United

11   States, 18 U.S.C. Section 371), and on Counts Two through Thirteen

12   (False statements in loan applications, 18 U.S.C. Section 1014).

13   Therefore, Alfonzo and Morales are exposed to a mandatory civil

14   penalty between $590,000 to $1,180,000 under 31 U.S.C. § 3729(a)(1)

15   -(7) . Alfonzo is exposed to an additional mandatory civil penalty

16   between $40,000 to $80,000 on account of at least eight more false

17   claims or statements in relation to FSA Livestock Indemnity Program

18   Alfonzo was charged and found guilty on Eight Counts (Counts Forty

19   Four through Fifty One) of false statements on application and/or

20   certification to obtain monies from the Farm Service Agency

21   Livestock Indemnity Program (18 U.S.C. Section 1014).

22   **C.   Costs**

23        In addition to treble damages and civil penalties, "[a] person

24   violating this subsection shall also be liable to the United States

Civil No. 05-1607 (JAF)                                    -30-

1    Government for the costs of a civil action brought to recover any

2    such penalty or damages". 31 U.S.C. §3729(a). See also BMY-Combat

3    Systems Division of Harsco Corporation v. United States, 44 Fed.Cl.

4    141 (Fed. Cl. 1999).

5    **D.   Statute of Limitations**

6         The False Claims Act contains the following limitations

7    period:

8              (b) A civil action under 3730 may not be
9              brought

10             (1) more than 6 years after the date on which
11             the violations of section 3726 is committed, or

12             (2) more than 3 years after the date when facts
13             material to the right of action are known or
14             reasonably should have been known by the
15             official of the United States charged with
16             responsibility to act in the circumstances, but
17             in no event more than 10 years after the date
18             on which the violation is committed,

19             whichever occurs last.

20   31 U.S.C. §3731.

21        Thus, the United States may bring a False Claims Act action

22   either within six years from the date of the violation of the Act,

23   or up to three years from the date the "official of the United

24   States charged with responsibility to act in the circumstances" is

25   made aware of the facts "material to the right of action,'

26   whichever occurs last. No more than ten years, however, may elapse

27   from the date of the violation to the date the action is commenced.

Civil No. 05-1607 (JAF)                                          -31-

1          The present action is related to a fraudulent scheme to have

2     FSA loans approved that according the superseding indictment began

3     on or about October 13, 1998 until on or about February 2002. In

4     fact, all of the requests for obligations of funds for the loans in

5     this case were made on June 9, 1999. All the loan funds were

6     disbursed after that date. Payment by the United States Government

7     triggers statute of limitations period under the False Claims Act.

8     See U.S. ex rel. Duvall v. Scott Aviation, 733 F.Supp. 159

9     (W.D.N.Y. 1990).  This civil action was filed on June 7, 2005, and,

10    therefore, is within the six-year statute of limitations.

11                                  **III.**

12    _____**Collateral Estoppel**_____

13         A final judgment rendered in favor of the United States in any

14    criminal proceeding charging fraud or false statements, whether

15    upon verdict after trial or upon a plea of guilty or nolo

16    contendere, shall estop the defendant from denying the essential

17    elements of the offense in any action which involves the same

18    transaction as in the criminal proceedings and which is brought

19    under 31 U.S.C. Section 3730 (a) or (b). 31 U.S.C. Section 3731(d).

20    "It is well established that a prior criminal conviction may work

21    an estoppel in favor of the government in subsequent civil

22    proceedings." Emich Motors Corp. v. General Motors Corp., 340 U.S.

23    558, 568 (1951). See also U.S. v. Lamanna, 114 F.Supp.2d (W.D.N.Y.

24    2000), U.S. v. Fliegler, 756 F.Supp. 688 (E.D.N.Y. 1990) and U.S.

Civil No. 05-1607 (JAF)                                                    -32-

1    <u>v. Stella</u>, 839 F.Supp. 92 (D.P.R. 1993), reversed on other grounds

2    in <u>U.S. v. Rivera</u>, 55 F 3rd 703 (1st Cir 1995) "Collateral estoppel,

3    like the related doctrine of res judicata, has a dual purpose of

4    protecting litigants from the burden of relitigating identical

5    issues with the same party or his privy and of promoting judicial

6    economy by preventing needles litigation." <u>Parklane Hosiery Co.,</u>

7    <u>Inc. v. Shore</u>, 439 U.S. 322, 326 (1979). "Collateral estoppel does

8    not involve the 're-examination' of any fact decided by a jury. On

9    the contrary, the whole premise of collateral estoppel is that once

10   an issue has been resolved in a prior proceeding, there is no

11   further factfinding function to be performed." <u>Id</u>. at 336 n. 23.

12       After reviewing the superseding indictment and judgments

13   against Alfonzo and Morales in criminal case 03-124 (JAG) and the

14   civil record and other allegations in this case, it is evident that

15   the civil complaint is based on the same allegations that served as

16   the basis for Alfonzo's and Morales' convictions. Alfonzo and

17   Morales have not presented anything to determine otherwise.

18   Therefore, Alfonzo and Morales are collaterally estopped form

19   relitigating the issues subject to this action.

20                              **IV.**

21                      **<u>Judgment by Default</u>**

22       Rule 55(b)(2) of the Federal Rules of Civil Procedure allow

23   for the Court to enter judgment by default against any party who is

Civil No. 05-1607 (JAF)                                         -33-

1    in default and has failed to plead or otherwise defend as provided

2    by said rules.

3                    [R]ule 55(b)(2) prescribes the procedure to be
4                    followed when a judgment is sought against a
5                    litigant in default in situations that lie
6                    beyond the powers delegated to the clerk under
7                    Rule 55(b)(1). Thus, the rule provides that "if
8                    the party against whom judgement by default is
9                    sought has appeared in the action, the party
10                   (or, if appearing by representative, the
11                   party's representative) shall be served with
12                   written notice of the application for judgment
13                   at least 3 days prior to the hearing on such
14                   application. The court has discretion to decide
15                   whether to enter a judgment by default, however
16                   and Rule 55(b)(2)empowers the district judge to
17                   hold hearings or "order such references as it
18                   deems necessary and proper" to aid its exercise
19                   of this discretion. . . .

20   Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d

21   §2684. (footnotes omitted) (emphasis supplied)

22       As of this date, more than 120 days have elapsed from the

23   personal service of process, and defendants have failed to answer,

24   plead or otherwise defend in this case.

25                   Rule 55 does not require that testimony be
26                   presented as a prerequisite to entry of a
27                   default judgment, and thus several courts have
28                   determined that a hearing is not required
29                   before entering a default. However, when it
30                   seems advantageous, a court may conduct a
31                   hearing to determine whether to enter judgment
32                   by default. The hearing is not considered a
33                   trial, but is in the nature of an inquiry
34                   before the judge.

35   Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d

36   §2688. (footnotes omitted) (emphasis supplied)

Civil No. 05-1607 (JAF)                                        -34-

1       In this case, it is within the court's discretion to decide

2   whether to enter judgment by default, hold a hearing, including a

3   hearing "in the nature of an inquiry," or enter any order as it

4   deems necessary and proper to its exercise of this discretion. This

5   court holds that Rule 55 does not require that testimony be

6   presented as a prerequisite to entry of default judgment. <u>See</u>

7   <u>United States v Cabrera-Diaz</u>, 106 F. Supp. 2d 234, 243(2000).

8                                   **V.**

9                               <u>**Conclusion**</u>

10      A review of the record and case law reveals that co-defendants

11  Alfonzo, Morales and the conjugal partnership constituted by both

12  have knowingly presented or caused to be presented false claims to

13  the United States; and/or caused to be made or use false statements

14  to get false claims paid or approved by the United States. The

15  facts in this case are uncontested.

16      In view of the foregoing, plaintiff's Motion for Judgment by

17  Default against co-defendants Alfonzo, Morales and the conjugal

18  partnership constituted by both is **GRANTED.** Judgment shall be

19  entered in its favor and against co-defendants Alfonzo, Morales and

20  the conjugal partnership constituted by both, jointly and

21  severally, for treble (three times) the damages sustained by the

22  United States on account of the false claims/statements submitted

23  in relation to the emergency and operating loans in the amount of

24  $10,431,530.00, which totals an aggregate amount of $31,294,590.00,

1    less the amounts repaid to the United States for the emergency

2    loans ($5,467,190.68) and for the operating loans ($1,205,433.90),

3    for a total net amount of $24,621,965.42, plus mandatory civil

4    penalties against co-defendants Alfonzo, Morales and the conjugal

5    partnership constituted by both, jointly and severally, in the

6    amount of $10,000.00 for each one of the one-hundred eighteen false

7    statements or false claims submitted by Alfonzo and Morales to the

8    FSA in relation to the emergency and operating loans, for a total

9    of $1,180,000.00. Also, Judgment shall be entered against co-

10   defendant Alfonzo alone, in addition to the amounts specified

11   above, for treble (three times) the damages sustained by the United

12   States on account of the false statements/claims submitted by him

13   in relation to the Livestock Indemnity Program (LIP) in the amount

14   of $364,784.00,  which totals an aggregate amount of $1,094,352.00,

15   less the amounts repaid to the United States on said LIP which

16   total $58,297.00, for a total net amount of $1,036,055.00, plus

17   additional mandatory civil penalties against co-defendants Alfonzo

18   alone, in the amount of $10,000.oo for each one of the eight false

19   statements or false claims submitted by Alfonzo to the FSA on

20   account of the Livestock Indemnity Program (LIP), for the total net

21   amount of $80,000.00, plus the investigation costs incurred by the

22   plaintiff as the result of their false claims penalties. Judgment

23   shall be entered accordingly.

24        **IT IS SO ORDERED.**

Civil No. 05-1607 (JAF)                                          -36-

1           San Juan, Puerto Rico, this 8th day of June, 2006.

2                                           S/José Antonio Fusté
3                                           JOSE ANTONIO FUSTE
4                                           Chief U.S. District Judge